EXHIBIT C

## IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

MARLA CAPLAN )
9209 Fall River Lane )
Potomac, Maryland 20854 )
)
)
        Plaintiff, )
)
)
v. )                                      Case No.
)
)
SYNERGI HOLDINGS, INC., )
SYNERGI PARTNERS, INC., f/d/b/a )
NEON WORKFORCE TECHNOLOGIES, INC. )
151 West Evans Street )
Florence, South Carolina 29501, )
)
)
        Serve: )
        Jeffrey T. Stover, Esquire, or )
        Ashley Brown Hogsette Esquire, or )
        Perry MacLennan, Esquire )
        Haynesworth Sinkler Boyd, P.A. )
        134 Meeting Street, 3rd Floor )
        Charleston, South Carolina 29401 )
)
)
JAMES A. BROWN, JR., )
KERSTIN NEMEC, )
TIM NORWOOD, )
FRANK CHISHOLM, )
151 West Evans Street )
Florence, South Carolina 29501, )
)
)
        Serve: )
        Jeffrey T. Stover, Esquire, or )
        Ashley Brown Hogsette Esquire, or )
        Perry MacLennan, Esquire )
        Haynesworth Sinkler Boyd, P.A. )
        134 Meeting Street, 3rd Floor )
        Charleston, South Carolina 29401 )
)
)
JON SHANNON SCOTT, )
8739 Carrington Lake Ridge )
Trussville, Alabama 35173, )
)
)
)

RECEIVED

MAR 13 2019

Clerk of the Circuit Court
Montgomery County, Md.

Serve:                                          )
Russell L. Irby, Esquire                        )
Butler Snow, LLP                                )
1819 Fifth Avenue North, Suite 1000             )
Birmingham, Alabama 35203                       )
                                                )
CHRISTOPHER CHAD WITCHER                         )
1818 Oxford Drive, N.W.                          )
Cullman, Alabama 35057,                          )
                                                )
Serve:                                          )
Jeffrey T. Stover, Esquire, or                  )
Ashley Brown Hogsette Esquire, or               )
Perry MacLennan, Esquire                        )
Haynesworth Sinkler Boyd, P.A.                   )
134 Meeting Street, 3rd Floor                    )
Charleston, South Carolina 29401                )
                                                )
And                                             )
                                                )
GEORGE MICHAEL MCCULLARS,                        )
3 Poplar Point                                  )
Gadsden, Alabama 35905,                         )
                                                )
Serve:                                          )
Phil Williams, Esquire                          )
Williams & Associates, LLC                      )
2100 Club Drive, Suite 150                      )
Gadsden, Alabama  35901                         )
                                                )
Defendants.                                     )
                                                )

## COMPLAINT

COMES NOW, Plaintiff, Marla Caplan (hereinafter "Ms. Caplan" or "Plaintiff"), by and

through counsel, Eric L. Siegel of Kalbian Hagerty, LLP, and hereby files this action against

Defendants Synergi Holdings, Inc., Synergi Partners, Inc. (formerly doing business as Neon

Workforce Technologies ("Neon") upon acquisition by Synergi Holdings, Inc. and prior to Neon's

dissolution in January 2019), James A. Brown, Jr., Kerstin Nemec, Tim Norwood, Frank

Chisholm, J. Shannon Scott, Christopher Chad Witcher, and George Michael McCullars (hereinafter collectively referred to as "Defendants"), and for cause states:

## INTRODUCTION

1.  This lawsuit involves Defendants' failure and/or refusal to pay Plaintiff Marla Caplan all unpaid "wages" owed to her, including but not limited to unpaid Neon salary, unpaid paid time off hours upon the termination of her employment from Synergi, and unpaid earned sales commissions for revenues brought to her former employers Neon Workforce Technologies, Inc. (hereinafter "Neon") and upon acquisition, Synergi Holdings, Inc., in violation of the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code. Ann., Lab. & Empl. § 3-501 *et seq*. This lawsuit also brings claims for breach of contract, unjust enrichment, fraudulent misrepresentation, successor liability, constructive trust and for an accounting.

## JURISDICTION AND VENUE

2.  This Court has subject matter jurisdiction over this matter pursuant to MD. CODE ANN., CTS. & JUD. PROC. § 1-501, as Plaintiff, at all relevant times, has been located and done, and continues to do, business in the State of Maryland, Montgomery County, and Defendants at all relevant times, has done, and/or continues to do, business in the State of Maryland.

3.  This Court has personal jurisdiction over Defendants pursuant to MD. CODE ANN., CTS. & JUD. PROC. § 6-102(a) because Defendants will be served with process, through their respective legal counsel by consent, in the state where each respective counsel does business as set forth in the case caption above, and also pursuant to MD. CODE ANN., CTS. & JUD. PROC. § 6-103(b) because Defendants, and/or each of them, transact

3

business, perform work or service, and caused injury to Plaintiff in the State of Maryland.

4.  Montgomery County is an appropriate venue for this action pursuant to MD. CODE ANN., CTS. & JUD. PROC. § 6-201(b) because (1) this is an action against multiple defendants without a common venue, and, more importantly, (2) Montgomery County is the county wherein Plaintiff does business and her cause of action arose.

## THE PARTIES

5.  Plaintiff Marla Caplan is a Maryland resident with her principal place of business at 9209 Fall River Lane, Potomac, Maryland 20854.

6.  Defendant Synergi Partners, Inc., is a South Carolina Statutory Close Corporation. At all relevant times, Synergi Partners, Inc.'s principal place of business is located at 151 West Evans Street, Florence, South Carolina 29501, and it has done, and continues to do, business in the State of Maryland.  Synergi Partners, Inc. was incorporated on or about December 5, 2017.

7.  Defendant Synergi Holdings, Inc., currently doing business as "Synergi Partners" (hereinafter Synergi Partners, Inc. and Synergi Holdings, Inc. shall be collectively referred to as "Synergi"), as evidenced by the name depicted on its website, is a South Carolina corporation.  At all relevant times, Synergi's principal place of business is located at 151 West Evans Street, Florence, South Carolina 29501, and it has done, and continues to do, business in the State of Maryland.  On or about December 14, 2017, by Amendment to its Articles of Incorporation, Synergi Partners, Inc. changed its name to Synergi Holdings, Inc., a Statutory Close Corporation.

8.  Defendant James "Jim" A. Brown, Jr. (hereinafter "Brown") is Chief Executive Officer of Synergi Holdings, Inc., and a shareholder.  At all relevant times, Brown has been located

in the State of South Carolina with his business address at 151 West Evans Street, Florence, South Carolina 29501, and has done, and continues to do, business in the State of Maryland through Defendant Synergi.

9.    Defendant Kerstin Nemec (hereinafter "Nemec") is Chief Service and Product Officer of Synergi Holdings, Inc., and a shareholder.  At all relevant times, Nemec has been located in the State of South Carolina with her business address at 151 West Evans Street, Florence, South Carolina 29501, and has done, and continues to do, business in the State of Maryland through Defendant Synergi.

10.    Defendant Tim Norwood (hereinafter "Norwood") is Executive Vice President for Sales and Government Relations of Synergi Holdings, Inc., and a shareholder.  At all relevant times, Norwood has been located in the State of South Carolina with his business address at 151 West Evans Street, Florence, South Carolina 29501, and has done, and continues to do, business in the State of Maryland through Defendant Synergi.

11.    Defendant Frank Chisholm (hereinafter "Chisholm") is Chief Financial Officer of Synergi Holdings, Inc., and a shareholder.  At all relevant times, Chisholm has been located in the State of South Carolina with his business address at 151 West Evans Street, Florence, South Carolina 29501, and has done, and continues to do, business in the State of Maryland through Defendant Synergi.  (Hereinafter, Defendants Brown, Nemec, Norwood and Chisholm shall be collectively referred to as "Synergi Individual Defendants").

12.    Defendant Jon Shannon Scott (hereinafter "Scott") is Executive Vice President of Alliances for Synergi Holdings, Inc., and a shareholder.  At all relevant times, Scott has been located at 431 Broad Street, Gadsden, Alabama 35901 and/or 8739 Carrington Lake Ridge, Trussville, Alabama 35173, and has done, and continues to do, business in the State of

5

Maryland through Defendant Synergi. Scott also is former Chief Executive Officer and shareholder of Neon, which has done business and employed Plaintiff in the State of Maryland until Neon shares were acquired by Synergi on or about January 11, 2018.

13. Defendant Christopher Chad Witcher (hereinafter "Witcher") is Executive Vice President of Operations for Synergi Holdings, Inc., and a shareholder. At all relevant times, Witcher has been located at 1818 Oxford Drive, N.W., Cullman, Alabama 35057, and has done, and continues to do, business in the State of Maryland through Defendant Synergi. Witcher also is a former officer and shareholder of Neon, which has done business and employed Plaintiff in the State of Maryland until Neon shares were acquired by Synergi on or about January 11, 2018.

14. Defendant George Michael "Mike" McCullars (hereinafter "McCullars") has been located at 3 Poplar Point, Gadsden, Alabama 35905, and has done business in the State of Maryland through Neon. McCullars also is a former officer and shareholder of Neon, which has done business and employed Plaintiff in the State of Maryland until Neon shares were acquired by Synergi on or about January 11, 2018.

15. At all relevant times herein, Scott, Witcher and McCullars were the majority stockholders of Neon. (Hereinafter, Defendants Scott, Witcher and McCullars shall be collectively referred to as "Neon Defendants").

## STATEMENT OF FACTS COMMON TO ALL CLAIMS

16. On or about December 15, 2010, Ms. Marla Caplan was offered and accepted an at-will employment agreement with TCPC, Tax Credit Processing Center, LLC, as a Vice President of Partnership Development, which was primarily a sales position. She was instructed to work remotely from her home-based office in Maryland.

17. Ms. Caplan's primary responsibility in her new job was "to initiate and develop new partnerships with Neon Workforce Technologies, Inc." She was also responsible for projects associated with Neon's overall sales, marketing and training objectives.

18. Her employment relationship was with Neon. Ms. Caplan reported to Neon's Chief Executive Officer, Defendant Scott.

19. Neon was in the business of selling to existing and new employer clients tax credits under the IRS's Work Opportunity Tax Credits ("WOTC") Program and other tax credits, including but not limited to geographic incentives, empowerment zone tax credits, Indian employment tax credits, state and local government tax credits, and disaster incentives pursuant to the Hurricane Disaster Relief Act of 2017 (H.R. 3823, Section 503) and the Employee Retention Credit For Employers Affected by the California Wildfires.

20. Under Ms. Caplan's employment agreement, her total compensation package included a salary, other employment benefits, and a quarterly bonus (commissions) of five percent (5%) of each quarter's invoiced revenue from new business generated.

21. Defendant Scott signed Ms. Caplan's employment agreement in his capacity as Chief Executive Officer of Neon.

22. In addition, Defendant Scott, on behalf of Neon and the Neon Defendants, included as part of Ms. Caplan's compensation package a quarterly bonus on invoiced revenue (new business) of ten percent (10%) for any invoiced revenue (new business) directly generated and closed by her with a client.

23. During her employment with Neon, Ms. Caplan demanded of the Neon Defendants, together and/or individually, that they pay her earned but unpaid outstanding commissions.

24. In particular, after not receiving her earned commissions for almost a year, on or about June 10, 2014, Ms. Caplan emailed Defendant McCullars, demanding payment of earned commissions over the last 12 months and acknowledging that Neon had cashflow issues.

25. The last payment that Neon paid Ms. Caplan for sales and related work was in the amount of $28,636.46, or approximately that amount, for the period ending December 31, 2014.

26. Thereafter, for the period beginning January 1, 2015, and for each quarter thereafter, Ms. Caplan continued to perform the same job duties for clients assigned to her, including pursuing and obtaining business from new clients on behalf of Neon.

27. Each year for Neon's fiscal years 2015, 2016 and 2017 – Neon's fiscal year ran from July 1 through June 30 – Ms. Caplan received spreadsheets from Defendant McCullars ("McCullars Spreadsheets") setting forth the precise revenue collected by Neon from its clients, new and existing, attributable to Ms. Caplan.

28. By sending these spreadsheets, Defendant McCullars, on behalf of Neon and the Neon Defendants, admitted that Ms. Caplan was owed the earned commissions based on the invoiced revenue collected, as set forth in the McCullars Spreadsheets.

29. During her employment with Neon, the Neon Defendants, together or individually, told Ms. Caplan that Neon was having cashflow problems.

30. During her employment with Neon, the Neon Defendants, together or individually, told Ms. Caplan to be patient with the outstanding earned commissions owed to her and that she would be paid.

31. The Neon Defendants, together or individually, acknowledged that Neon owed Ms. Caplan the outstanding earned commissions for the invoiced revenue (new business) received from Neon clients attributed to all sales efforts.

32. During her employment with Neon for the period from January 1, 2015 through January 11, 2018, Ms. Caplan on more than one occasion demanded from the Neon Defendants, together or individually, that she be paid her earned commissions. Ms. Caplan's demands for payment were both verbal and in writing through emails.

33. On June 10, 2014 at 2:20 p.m., Ms. Caplan emailed Mr. McCullars stating, "It has been almost a year since I received a commission check, please let me know when I can expect one for the last 12 months. I know it is a tough cash-flow period and we have a lot going on, but I also know that I work very hard for the company and I am one of your most dedicated employees and deserve to be compensated."

34. Neither Defendant McCullars nor any of the other Neon Defendants ever responded to Ms. Caplan's June 10, 2014, email demand for payment of her outstanding earned commissions.

### The Neon Defendants Fail to Pay Ms. Caplan Commissions for Fiscal Year 2015

35. On March 19, 2015 at 2:47 p.m., Ms. Caplan emailed Defendant McCullars, stating that even though her base salary in her employment agreement was $90,000.00 annually, her W-2 forms from Neon did not show that amount. This resulted in not being paid approximately $3,000.00 per year in base salary, which she demanded.

36. Additionally, in her March 19, 2015, email, she demanded her earned commissions for the second part of 2013 and 2014 for "TaxBreak", and she was expecting to receive her commissions for any payroll and other sales. She concluded the email by stating, "Please let me know when I will start receiving payments."

37.     Neither Defendant McCullars nor any of the other Neon Defendants ever responded to Ms. Caplan's March 19, 2015, email demand for payment of her outstanding earned commissions.

38.     After three months, on June 25, 2015 at 9:56 a.m., Ms. Caplan emailed McCullars and Scott stating, "Ok gentlemen with the fiscal year ending next week and having repeatedly asked about my commission with no results, please let me know when I can expect payment."

39.     Finally, in an email from Defendant McCullars to Ms. Caplan dated June 30, 2015 at 2:45 p.m., McCullars stated: "Check is on its way. The check you receive will cover commissions through 12/31/2014. *I will accrue for Jan thru June of this year and get that paid after our year end close.* The amount is $28,636.46." (Emphasis added). Defendant Scott was copied on that email.

40.     Neon and the Neon Defendants did not pay Ms. Caplan the earned commissions owed for fiscal year 2015, which ended June 30, 2015. This nonpayment was contrary to McCullars' admission in his June 30, 2015, email that Neon owed Ms. Caplan the money and would continue to accrue it.

41.     After the close of fiscal year 2015, Defendant McCullars, on behalf of Neon, emailed to Ms. Caplan a spreadsheet (McCullars Spreadsheet), which calculated "invoiced revenue (new business)" collected by Neon for the period from January 1,2014 through May 31, 2015. The total revenue that Neon collected for that period was $392.433.12.

42.     After applying the 5% quarterly bonus formula under Ms. Caplan's December 15, 2010, employment agreement, Ms. Caplan was owed $19,621.00 in earned sales commissions for fiscal year 2015, ending June 30, 2015.

43.   Also, Neon and the Neon Defendants did not pay Ms. Caplan the salary differential in 2015 that she was owed based on her $90,000.00 annual base salary set forth in her employment contract. Neon and the Neon Defendants continued to short her paychecks so that the annual salary actually paid to her was closer to approximately $86,000.00. This nonpayment was contrary to her employment contract.

### The Neon Defendants Fail to Pay Ms. Caplan Commissions for Fiscal Year 2016

44.   Another fiscal year ending June 30, 2016 went by, and Neon and the Neon Defendants failed to pay Ms. Caplan the earned commissions owed to her. She continued to demand payment through this entire period. The Neon Defendants continued to acknowledge that they owed her the money but that they were not in the position at the time to pay it.

45.   After the close of fiscal year 2016, Defendant McCullars, on behalf of Neon, emailed to Ms. Caplan a spreadsheet (McCullars Spreadsheet), which calculated "invoiced revenue (new business)" collected by Neon for the period for fiscal year 2016, ending June 30, 2016. The total revenue that Neon collected for that period was $628.672.77.

46.   After applying the 5% quarterly bonus formula under Ms. Caplan's December 15, 2010, employment agreement, Ms. Caplan was owed $31,433.00 in earned sales commissions for fiscal year 2016, ending June 30, 2016.

47.   Also, Neon and the Neon Defendants did not pay Ms. Caplan the salary differential in 2016 that she was owed based on her $90,000.00 annual base salary set forth in her employment contract. Neon and the Neon Defendants continued to short her paychecks so that the annual salary actually paid to her was closer to approximately $86,000.00. This nonpayment was contrary to her employment contract.

48. On or about November 15, 2016, in response to a request from Mr. Ken Williams, a Neon employee who was in the process of "reviewing and standardizing a commission process for internal employments," Ms. Caplan emailed Mr. Williams and shared that her commission compensation plan was "5% each quarter of total billed revenue for" partners of Neon attributed to all sales efforts.

49. At no time did the Neon Defendants, together or individually, deny that Ms. Caplan was entitled to receive her earned commissions.

50. At no time did the Neon Defendants, together or individually, deny that Ms. Caplan was entitled to receive her $90,000.00 base annual salary as reflected in her employment contract.

### Ms. Caplan Continues her Sales Responsibilities for Neon Throughout 2017

51. On or about April 20, 2017, Defendant Witcher emailed a document dated April 5, 2017, to Ms. Caplan to sign "regarding her new role" with Neon. That "new role" would be in addition to her existing sales responsibilities for Neon.

52. In response, Ms. Caplan emailed Defendant Witcher: "[W]hat about commissions that are owed to me? New sale commissions? This takes my salary down to $83,221 which has been an error and Mike was made aware of as my original offer letter has the salary of $90,000 and I was told an adjustment would be made…."

53. The April 5, 2017 letter set forth terms and stated explicitly at the end: *"In the event the Company does not receive the original offer of employment letter executed by you by EOB (5th of April 2017), the offer shall be revoked in all respects and shall be of no force and effect."* (Emphasis added).

54. Ms. Caplan did not sign that April 5, 2017 "new role" letter. By its terms, the offer was revoked in all respects and was of no force and effect.

55. Given Ms. Caplan's at-will employment status with Neon, Neon could have terminated Ms. Caplan's employment given that she did not execute the April 5, 2017 letter, as requested by Defendant Witcher.

56. Ms. Caplan continued to work for Neon after April 5, 2017 and continued to perform her sales responsibilities on behalf of the company.

57. The Neon Defendants knew and encouraged Ms. Caplan to continue to perform her sales responsibilities. The Neon Defendants continued to permit her to perform sales responsibilities and obtain the sales revenue for Neon associated with her efforts.

58. Ms. Caplan also assumed some additional responsibilities in managing client relations with existing Neon clients starting in April 2017 as an executive of the Neon team.

59. As of March 31, 2017, Neon owed Ms. Caplan at least $107,215.00 in outstanding earned commissions for her efforts on behalf of the company.

**The Neon Defendants Pursue a Sale of Neon Shares to Synergi**

60. In or around June 2017, Defendant Scott informed Ms. Caplan that the Neon Defendants were going to sell Neon.

61. No further discussion about the April 5, 2017 letter from Defendant Witcher occurred until June 2017. On or about June 13, 2017, Connie Heald, on behalf of Defendant Witcher, emailed Ms. Caplan to follow up on the letter referencing "the change in responsibilities dated April 5, 2017." Ms. Heald stated that Defendant Witcher had signed the letter, but Ms. Heald did not receive a copy executed by Ms. Caplan. Upon information and belief, Ms. Heald was Neon's human resources manager.

62. In response to the June 13, 2017, email, Ms. Caplan emailed her back, stating: "I had asked Chad about commissions owed and how new sales commissions were going to be handled and never received a response is why I did not sign."

**The Neon Defendants Fail to Pay Ms. Caplan Commissions for Fiscal Year 2017**

63. After the close of fiscal year 2017, Defendant McCullars, on behalf of Neon, emailed to Ms. Caplan a spreadsheet (McCullars Spreadsheet), which calculated "invoiced revenue (new business)" collected by Neon for the period for fiscal year 2017, ending June 30, 2017. The total revenue that Neon collected for that period was $536,299.17.

64. After applying the 5% quarterly bonus formula under Ms. Caplan's December 15, 2010, employment agreement, Ms. Caplan was owed $26,815.00 in earned sales commissions for fiscal year 2017, ending June 30, 2017.

65. In addition to not paying Ms. Caplan the earned sales commissions owed to her, Neon and the Neon Defendants continued to not pay Ms. Caplan the salary differential in 2017 that she was owed based on her $90,000.00 annual base salary set forth in her employment contract. Neon and the Neon Defendants continued to short her paychecks so that the annual salary actually paid to her was closer to approximately $86,000.00. This nonpayment was contrary to her employment contract.

66. On or before January 11, 2018, the Neon Defendants, and/or any of them individually, signed disclosure documents with Synergi as part of the due diligence process regarding the potential sale of Neon shares to Synergi.

67. On or before the January 11, 2018 closing date of the sale of Neon shares to Synergi, the Neon Defendants, and/or any of them individually, knew that Neon owed Ms. Caplan outstanding earned commissions for all sales and other related work.

14

68.     The Neon Defendants, and/or any of them individually, did not disclose to Synergi prior to the January 11, 2018 closing of the sale of Neon shares to Synergi that Neon owed Ms. Caplan outstanding earned commissions for all sales and other related work.

69.     In or around the fall of 2017, during the period from approximately September through December 2017, Neon executive team member Eric Duncan (hereinafter "Duncan") told Ms. Caplan that she needed to help guide Defendant Scott to get the sale of Neon shares completed because Defendant Scott trusted her verses Duncan and Defendant Witcher. Both Duncan and Defendant Witcher repeatedly encouraged Ms. Caplan to help "push the sale through" as "that was the only way [she] would ever get money that was owed to [her]."

70.     Defendant Witcher told Ms. Caplan on one or more occasions words to the effect that she had to tell Defendant Scott that he had to be reasonable in demanding terms of sale from Synergi or "you will not get your commissions."

71.     In or around the fall of 2017, during the period from approximately September through December 2017, Duncan, who served as Neon's Chief Technology Officer and/or Chief Information Officer, told Ms. Caplan on one or more occasions words to the effect that she had to tell Defendant Scott that he had to be reasonable in demanding terms of sale from Synergi or "you will not get your commissions."

72.     On more than one occasion, one or all of the Neon Defendants told Ms. Caplan that once Neon was sold to Synergi, Ms. Caplan would receive all outstanding earned sales commissions, which Neon owed to her.

73.     After not receiving outstanding commissions from Neon after repeated requests, in or around December 2017, Ms. Caplan told Duncan that she spoke to an attorney who said

that she should demand payment of her commissions immediately or stand in the way of, or prevent, the sale of Neon shares to Synergi.

74. On or before the January 11, 2018 closing date of the sale of Neon shares to Synergi, Neon owed Duncan approximately $50,000.00 in accounts payable.

75. The Neon Defendants, and/or any of them individually, did not disclose to Synergi prior to the sale of Neon shares to Synergi the outstanding debt obligation to Duncan.

**Synergi acquires Neon, and Ms. Caplan begins her employment with Synergi**

76. On or about January 11, 2018, Synergi Partners, Inc. acquired Neon Workforce Technologies, Inc., pursuant to a Stock Purchase Agreement wherein a part of the purchase price was placed in escrow in order to pay liability that might materialize as a result of non-disclosure by Neon and/or its shareholders.

77. On or about January 11, 2018, the date of the sale of Neon shares to Synergi, Duncan received payment in full for his outstanding accounts payable.

78. On or after January 11, 2018, Ms. Caplan became employed by Synergi under the same employment terms and conditions as when she was employed by Neon. In particular, she worked for Synergi doing primarily sales responsibilities to obtain new business for the company.

79. At Synergi, Ms. Caplan was under the same commission compensation arrangement as when she worked for Neon.

80. Synergi neither discussed nor gave Ms. Caplan a new written employment agreement setting forth any new responsibilities or any new compensation package.

81. Ms. Caplan continued to work under the original employment agreement that she received from Defendant Scott on behalf of Neon in 2010.

82.   By the actions and words of the Synergi Individual Defendants, they and Synergi permitted and encouraged Ms. Caplan to continue in her previous sales role to seek and obtain new business and associated revenues for the company from existing and new clients. Ms. Caplan continued to perform her sales responsibilities for Synergi.

83.   Neither Synergi nor the Synergi Individual Defendants ever told Ms. Caplan that she should no longer pursue sales opportunities for the company.

84.   At no time from January 11, 2018 through approximately December 20, 2018, did Synergi and/or the Synergi Individual Defendants, together or individually, ever inform Ms. Caplan that she would not be paid earned commissions for all sales efforts on behalf of Synergi.

85.   At no time from January 11, 2018 through approximately December 20, 2018, did Synergi and/or the Synergi Individual Defendants, together or individually, ever inform Ms. Caplan that her compensation structure with Synergi was salaried only.

**Ms. Caplan Demands Payment of Neon Commissions from Synergi Defendants**

86.   During her employment with Synergi, Ms. Caplan discussed her role and outstanding commissions with Defendants Brown, Chisholm, Nemec, Witcher and Scott.

87.   In or around January 2018, Ms. Caplan approached Defendants Brown and Chisholm, together and/or separately, and told them that she was owed outstanding earned commissions by Neon.

88.   On or about January 16 or 17, 2018, Ms. Caplan spoke with Defendant Chisholm about the outstanding earned commissions owed to her. Defendant Chisholm told Defendant Brown about the issue as well. In response, Brown sent a text message to Ms. Caplan that he would discuss the issue further with Ms. Caplan the following day.

89.  On or about January 17, 2018, Ms. Caplan and Defendant Brown began conversations about the outstanding earned commissions owed to her by Neon.

90.  In or around January 2018, Ms. Caplan asked Synergi and/or Synergi Individual Defendants, together or individually, for final revenue statements from Neon and access to data so that either she or Synergi could compute exactly what earned commissions were owed to her by Neon for the period from January 1, 2015 through approximately January 31, 2018.

91.  After February 1, 2018, Synergi received additional revenues from Neon clients attributable to Ms. Caplan's sales efforts for the period from January 1, 2015 through approximately December 31, 2018.  Synergi has not paid Ms. Caplan any outstanding earned commissions associated with that additional Neon revenue.

92.  After February 1, 2018, Synergi received revenue for Neon deals that she booked with new and existing Neon clients prior to January 31, 2018.  Synergi has not paid Ms. Caplan any outstanding earned commissions associated with those pre-January 31, 2018 deals booked.

93.  In addition, after the acquisition of Neon shares and during 2018, Synergi learned that Neon did not bill its clients for all of the services requested by the client.  As a result, Synergi pursued and collected millions of dollars for additional tax credit sales and services that were never recognized from Ms. Caplan's clients prior to the termination of her employment with Synergi.  Synergi has not paid Ms. Caplan any outstanding earned commissions associated with that additional revenue.

**Synergi Begins Receiving Complaints for Unpaid Sales Commissions and Lawsuits from Other Former Neon Employees and Vendors**

94.     Starting in or around January 2018 and thereafter, more than one company and/or former Neon employee has demanded and/or sued Neon for undisclosed outstanding debts and liabilities, including but not limited to unpaid commissions, unpaid stock redemption agreement obligations owed to Mr. Ron Beglin, and unpaid payments and/or royalties associated with a Software Acquisition Agreement to purchase software from Hiring Automation, LLC, known as "Click Onboard."

95.     During the time period from January 2017 through the present, the following former Neon employees either sent demand letters or filed lawsuits against Neon and/or Synergi seeking unpaid earned commissions that former Neon employees failed to receive from the Neon Defendants: Mr. Kurt Swauger, Ms. Heidi Padilla, Mr. Ken Williams, Mr. Dee Grimes, Mr. Chad Mountain and Ms. Beverly Cleary.

96.     Upon information and belief, the Neon Defendants previously represented to Mr. Swauger, Ms. Padilla, Mr. Williams, Mr. Grimes, Mr. Mountain and Ms. Cleary, or any number of them individually, that Neon acknowledged that it owed them their respective unpaid earned commissions. The Neon Defendants further stated to each of them that there would be a delay in payment because of cashflow issues.

97.     The Neon Defendants had no intention of paying the unpaid outstanding earned commissions owed to Mr. Swauger, Ms. Padilla, Mr. Williams, Mr.. Grimes, Mr. Mountain and Ms. Cleary.  That intention remained until they were forced to address the issue after receiving a settlement demand letter or lawsuit.

## Ms. Caplan Continued to Demand that Synergi Pay Her Unpaid Earned Commissions

98.   Starting in or around January 2018, Defendants Brown and/or Chisholm, together or separately, asked Duncan about outstanding commission debts owed to Ms. Caplan. Duncan acknowledged and confirmed that the outstanding earned commissions existed and were owed to Ms. Caplan.

99.   On or about January 30, 2018, Defendant Brown telephoned Ms. Caplan to review outstanding accounts payables from Neon. Ms. Caplan confirmed that there were open invoices and outstanding earned commissions owed to her. Brown went through Neon accounts payables with Ms. Caplan to verify that they were legitimate debt claims.

100.   In or around February 19, 2018, when Ms. Caplan was in Florence, South Carolina at the Synergi corporate meeting, Ms. Caplan again discussed with Synergi and the Synergi Individual Defendants, together or individually, that she was still owed outstanding earned commissions.

101.   In the management meeting conducted in or around February 19, 2018 in Defendant Chisholm's office at Synergi's headquarters in South Carolina, Ms. Caplan and others were discussing the success of a conference by or for "7-Eleven" and corporate potential for tax credits sales. Ms. Caplan showed them a stack of new signed contracts from 7-Eleven, a national convenience store chain, and 7-Eleven franchises.

102.   It is public knowledge and not a Neon and/or Synergi trade secret that 7-Eleven is a Synergi client because job applicants for Sales Associate Positions who apply on line at the 7-Eleven career page automatically are transferred to a Synergi Partners web page entitled, "seveneleven.synergipartners.com" once they start the online application process.

103. Acknowledging that Ms. Caplan had a commission compensation plan and structure with Synergi, Defendant Chisholm stated words to the effect, "At 10% commission, that's damn good money." Defendant Chisholm's statement was in reference to the commissions that Ms. Caplan would earn for her sales success in obtaining the business directly from 7-Eleven and its franchisees for tax credit sales and services.

104. During these management meetings in or around February 19, with the Synergi Individual Defendants, together or individually, Ms. Caplan learned that Synergi had held money from the sale of Neon shares for any claims that were not disclosed by the Neon Defendants. Defendants Brown, Nemec, Witcher and Chisholm separately confirmed that Synergi held back sales money to Defendant Scott and Defendant McCullars to cover any undisclosed liabilities of Neon.

105. On or about March 1, 2018, in a conversation between Defendant Scott and Ms. Caplan, he blamed her for payments not being made to him and Defendant McCullars from the sale of Neon shares to Synergi due to her sales commission claims.

106. Ms. Caplan regularly and repeatedly asked Defendants Brown, Nemec, Chisholm, Witcher and Scott, together or individually, for an accounting to confirm what outstanding earned commissions were owed to her since she did not have access to that information. She was never provided that information or an accounting prior to approximately November 2018. That purported accounting was not accurate and was incomplete.

107. In addition to WOTC sales to new and existing clients on behalf of Neon and Synergi, and associated earned commissions owed to Ms. Caplan, she also obtained other tax credit sales business from existing and new clients, including but not limited to geographic incentives, empowerment zone tax credits, Indian employment tax credits, state and local government

21

tax credits, and disaster incentives pursuant to the Hurricane Disaster Relief Act of 2017 (H.R. 3823, Section 503) and the Employee Retention Credit For Employers Affected by the California Wildfires.

108. Ms. Caplan has never received an accounting from either the Neon Defendants, Synergi or the Synergi Individual Defendants regarding earned commissions associated with those other tax credit sales that Ms. Caplan obtained for Neon and/or Synergi.

109. Ms. Caplan has never received any earned commissions from either the Neon Defendants, Synergi or the Synergi Individual Defendants associated with any of the above-named tax credit sales that Ms. Caplan obtained for Synergi and/or Neon.

110. On or around March 21, 2018, Ms. Caplan emailed Defendant Brown and copied Defendant Chisholm to set forth in detail the outstanding earned commissions that Neon owed her. These outstanding commissions were based on information that Ms. Caplan had at the time, but she explained that she was owed more because she did not have access to all the revenue data associated with all sales efforts.

111. In that March 21, 2018 email, which included attachments, she attached a list of all clients that she closed as well as the last commission statement that she received from Neon. She explained that the commission structure was 5% for all partner sales and 10% for anything directly closed by her with a partner client. She stated that 7-Eleven "was to be considered direct since no partners commission was being paid and we were receiving the monthly stipend."

112. In that March 21, 2018, email, Ms. Caplan shared with Defendant Brown: "When I would ask for the commission to be paid, I was always told that they did not have the cash flow and *they would 'make it right.' At the time, I had no reason to not trust them since they*

*had paid previously*.... Please let me know if you need any additional information. I appreciate that you are looking into all of this and apologize that this is a distraction to the team." (Emphasis added).

113.    When Ms. Caplan began her employment with Synergi, she reported to Defendant Nemec as her supervisor. She also continued to work directly with Defendant Scott on her sales responsibilities for Synergi.

114.    In or about April 2018, Defendant Nemec acknowledged to Ms. Caplan that she had a commission structure in place to compensate her for all sales efforts. Defendant Nemec acknowledged that Ms. Caplan continued to be compensated based on the commission compensation plan when she was employed by Neon. Nemec told Ms. Caplan that Synergi needed to address a new commission structure with Ms. Caplan "so it does not bite us in the ass."

115.    Neither Synergi nor the Synergi Individual Defendants ever revised Ms. Caplan's commission structure. She continued to be compensated based on the commission structure and practice that was in place when she was employed by Neon.

116.    On or about May 14, 2018, the employment of Ms. Connie Heald, Human Resources Director in Alabama who was working with Defendants Scott and Witcher, was terminated. Upon her departure, she informed Ms. Caplan in a text message exchange: "Get your commission." As a human resources manager, Ms. Heald was a manager for Synergi at the time she made the statement. Ms. Heald was also a manager for Defendants Scott and Witcher when she made that statement. Ms. Heald confirmed that Ms. Caplan was owed earned commissions and not paid them.

117.  On or about May 30, Defendant Brown was going to Puerto Rico for Synergi business involving the previous devastating Hurricane Maria. Marla Caplan texted him from her cell phone a picture of a business card with the contact name for a prospective client and joked: "I'll split the commission w you." He replied by text, "Mine is zero. So yours should be something." He ended that text message by adding a smiling emoji face with sunglasses. Brown's statement was an acknowledgement that Ms. Caplan's compensation at Synergi included being paid commissions for all sales efforts.

118.  On or about May 30, 2018 after a leadership meeting at Synergi, Defendant Scott, acknowledging that Ms. Caplan had a commission compensation structure and plan with Synergi, told her words to the effect, "Jim doesn't like paying commissions, so we need to put together a new company plan for you."

119.  Thereafter, Ms. Caplan continued to ask to be paid her unpaid earned commissions from Neon and Synergi for all sales efforts.

120.  On more than one occasion during her employment with Synergi, Defendant Scott told Ms. Caplan that she would be paid all outstanding commissions owed to her for work during her employment with Neon.

121.  On more than one occasion during her employment with Synergi, Defendant Scott told Ms. Caplan that she would be paid all outstanding commissions owed to her for work during her employment with Synergi.

**Ms. Caplan involves Legal Counsel to Demand Payment of Earned Commissions**

122.  After still being unpaid outstanding commissions, Ms. Caplan sought out legal counsel and engaged Steven Michael Sack, Esquire. On her behalf, Mr. Sack sent a letter dated October 17, 2018, demanding payment of all outstanding earned sales commissions owed to Ms.

Caplan by both Neon and Synergi and seeking an accounting for other wages owed.

123.    Ms. Caplan's last day of employment with Synergi was December 14, 2018.

### Synergi Fails to Pay Ms. Caplan Paid Time Off Upon Termination

124.    Upon her termination with Synergi, Ms. Caplan was owed two hundred sixty-four (264) hours of earned accrued paid time off ("PTO") hours. Synergi paid Ms. Caplan upon termination eighty (80) hours of accrued paid time off earned during her employment.

125.    The 264 accrued PTO hours for Ms. Caplan includes over two hundred forty-eight (248) hours carried over and grandfathered from her employment with Neon, per Ms. Caplan's pay stub dated December 14, 2018.

126.    Page 8 of the Neon Employee Handbook provides that PTO hours may be accrued from year to year without losing any of those PTO hours at the end of a given year.

127.    Synergi agreed that Ms. Caplan's PTO hours from Neon would be carried over when Ms. Caplan began her employment with Synergi.

128.    The Synergi Employee Handbook is silent regarding limiting the payout of earned accrued PTO hours for employees upon termination of employment.

129.    To date, Synergi has failed or refused to pay Ms. Caplan one hundred eighty-four (184) hours of earned accrued PTO.

130.    To date, Synergi has not paid Ms. Caplan any of the outstanding earned commissions for all sales efforts and closed business during her employment with Synergi.

131.    To date, Synergi has not paid Ms. Caplan any of the outstanding earned commissions for all sales efforts and closed business during her employment with Neon.

132.    Total earned commissions owed to Ms. Caplan for revenue from Neon partners through January 31, 2018 is in excess of approximately $107,215.10. This commission amount

does not include direct sales to clients from Neon.

133. This $107,215.10 commission amount is less than what is owed to Ms. Caplan because she was denied an accounting to learn the correct amount owed to her for her work at Neon.

134. Moreover, revenues from those Neon partner clients has continued to be received by Synergi after January 2018 through the end of Ms. Caplan's employment with Synergi. Ms. Caplan has earned commissions associated with the Neon partner client revenue received by Synergi through December 31, 2018.

135. Total earned commissions owed to Ms. Caplan for revenue from 7-Eleven and its franchisees through December 31, 2017 is at least $85,822.00. Moreover, there are additional revenues from 7-Eleven and its franchisees to be received by Synergi for sales from Ms. Caplan throughout her employment with Synergi. Accordingly, Synergi owes Ms. Caplan earned commissions for that revenue from 7-Eleven and its franchisees.

136. Ms. Caplan is entitled to commissions earned associated with 7-Eleven and its franchisee revenue received by Synergi.

## In January 2019, Synergi Dissolves Neon

137. On or about January 22, 2019, Defendant Synergi Holdings, Inc. dissolved Neon as an operating company. The Synergi Holdings, Inc. shareholders are Defendant Brown, Defendant Scott and Defendant Witcher.

138. Upon dissolution, Neon authorized Defendant Brown as President of Synergi Holdings, Inc. "to execute, deliver *and perform on behalf of [Neon], any and all documents associated to which [Neon] is a party* … subject to any modifications, amendments or concessions as the parties may deem appropriate." (Emphasis added).

139. Upon dissolution, Synergi, through its shareholders Brown, Scott and Witcher, "ratif[ied],

confirm[ed] and adopt[ed] all actions previously taken by [Neon], or by any agent or representative of [Neon]....”

140. Per the 2010 employment agreement with Ms. Caplan, Neon was her employer and obligated to pay Ms. Caplan earned commission compensation owed to her.

141. Neon and the Neon Defendants owe Ms. Caplan for earned commissions for the period from January 1, 2015 through January 31, 2018 for all invoiced revenue (new business) while employed by Neon.

142. Synergi, Defendant Brown and the Neon Defendants owe Ms. Caplan for earned commissions for the period from January 1, 2015 through January 31, 2018 for all invoiced revenue (new business) while employed by Neon.

143. Ms. Caplan generated new client sales on behalf of Synergi, involving several different tax credits, to no less than nineteen (19) new clients in the year 2018, for which she earned sales commissions (the identity of which will not be disclosed here in order to maintain confidentiality of Synergi clients).

144. Defendants Synergi and Synergi Individual Defendants, or any of them, directed Ms. Caplan to attend trade shows on behalf of Synergi to pursue new clients and potential tax credit sales opportunities on behalf of Synergi.

145. Synergi and the Synergi Individual Defendants owe Ms. Caplan for earned commissions for the period from January 11, 2018 through December 31, 2018 for all sales invoiced revenue (new business) while employed by Synergi.

146. Synergi, through its shareholders Brown, Scott and Witcher, ratified, confirmed and adopted all actions previously taken by Neon, or by any agent or representative of Neon, including Neon’s acknowledgement, or acknowledgements, that it owed Ms. Caplan

unpaid earned commissions while employed by Neon.

147.  Synergi, through its shareholders Brown, Scott and Witcher, ratified, confirmed and adopted all actions previously taken by Neon, or by any agent or representative of Neon, including Neon's acknowledgement, or acknowledgements, that Neon did not pay Ms. Caplan unpaid earned commissions owed to her while employed by Neon.

148.  When Neon was dissolved, Synergi and Neon commingled funds, revenues and/or property.

**Ms. Caplan is Denied Commissions Associated with Birddog HR Sales**

149.  Birddog HR is a client and partner of Synergi and a reseller of "Click Onboard" software, which is created and owned by Hiring Automation. LLC.

150.  Birddog HR is a former client and partner with Neon and a reseller of "Click Onboard" software, which is created and owned by Hiring Automation. LLC.

151.  Hiring Automation, LLC entered into a Software Acquisition Agreement ("Agreement") with Simple Onboard, LLC, a company affiliated with Neon.  Per the Agreement, Neon and Simple Onboard, LLC agreed to pay Hiring Automation, LLC $400,000.00 for the sale of "Click Onboard" software and to pay a 3% royalty fee on the gross sales of the software and support to clients of Neon.

152.  During her employment with Neon, Ms. Caplan sold to new and existing clients of Neon and Birddog HR licenses to use "Click Onboard" software and support.

153.  Neon collected $188,801.00, or approximately that amount, from Birddog HR for Ms. Caplan's sales of software licenses and support.

154.  Neon and the Neon Defendants never paid Ms. Caplan her ten percent (10%) earned commissions for the sale of the software licenses and support to Birddog HR's clients.

155.   Ms. Caplan is owed earned commissions for the sale of the software licenses and support to Birddog HR's clients in the amount of $18,880.00.

156.   Ms. Caplan has never received an accounting from Neon or the Neon Defendants of the entire invoiced revenue (new business) earned for the sale of the software licenses and support to Birddog HR's clients attributed to Ms. Caplan's sales efforts.

157.   Ms. Caplan also earned commissions for the sale of the software licenses and support to Birddog HR's clients on behalf of Synergi.  However, Ms. Caplan has never received an accounting from Synergi or the Synergi Individual Defendants of the entire invoiced revenue (new business) earned for the sale of the software licenses and support to Birddog HR's clients attributed to Ms. Caplan's sales efforts.

**Ms. Caplan is Owed Sales Commissions for Tax Credit Sales and Services to 7-Eleven**

158.   Ms. Caplan has also earned commissions from the sale of tax credits, including but not limited to WOTC tax credits, to 7-Eleven and its franchisees in the amount of or at least $85,822.00.

159.   Neither Synergi nor the Synergi Individual Defendants have paid Ms. Caplan for the earned sales commissions associated with the sale of tax credits to 7-Eleven and its franchisees.

160.   Ms. Caplan has never received an accounting from Synergi or the Synergi Individual Defendants of the entire invoiced revenue (new business) earned for the sale of tax credits to 7-Eleven and its franchisees attributed to Ms. Caplan's sales efforts.

161.   In order to calculate some of the sales commissions owed to Ms. Caplan for the completed sale of WOTC tax credits and other tax credits on behalf of Neon and/or Synergi, a job applicant hired by an employer client of Neon and/or Synergi must work a minimum number of hours in a given year in order for the employer to qualify to receive the tax

credit.

162.   It could take approximately eight to twelve months from Ms. Caplan's completed sale to a given new or existing client of Neon and/or Synergi for each respective company to collect invoiced revenue (new business) for that sale.

163.   As a result of the time lapse for a portion of her sales commissions to be fully recognized as earned based on the invoiced revenue (new business) collected by Neon and/or Synergi from sales by Ms. Caplan through the end of December 2018, Ms. Caplan may be owed more in earned sales commissions from Neon, the Neon Defendants, Synergi and the Synergi Individual Defendants for all invoiced revenue (new business) collected during or after her employment with each company.

164.   All conditions precedent for the filing of this lawsuit have been satisfied.

## COUNT I:
### VIOLATION OF MWPCL FOR DEFENDANTS' FAILURE TO PAY PLAINTIFF UNPAID NEON SALARY AND EARNED SALES COMMISSIONS

165.   Plaintiff realleges and incorporates by reference paragraphs 1 through 164 as if fully set forth herein.

166.   The MWPCL requires that "… [E]ach employer *shall* pay an employee … all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated." (Emphasis added).  Md. Code Ann., Lab. & Empl. § 3-505(a).

167.   All of the Defendants are employers under the MWPCL, as "employer" is broadly defined as "any person who employs an individual in the State …." Md. Code Ann., Lab. & Empl. § 3-501.

168.   One or all of the Defendants failed to pay Plaintiff wages due for work that she performed

at Neon, including her full annual salary at $90,000.00 and sales commissions, in violation of the MWPCL, Md. Code Ann., Lab. & Empl. § 3-505(a).

169. One or all of the Defendants did not act in good faith by refusing to pay the owed wages, even after Plaintiff repeatedly demanded throughout her employment payment of her unpaid salary and all unpaid earned sales commissions.

170. There has been a delay in payment since on or about March 31, 2015, to pay Plaintiff her full annual salary at $90,000.00 and earned sales commissions owed to her.

171. Repeatedly throughout Plaintiff's employment with Neon, one or all of the Defendants repeatedly acknowledged that they owed Plaintiff her unpaid $90,000.00 annual salary.

172. Repeatedly throughout Plaintiff's employment with Neon, one or all of the Defendants repeatedly acknowledged that they owed Plaintiff her unpaid earned sales commissions for all tax credits that she sold to new and existing Neon clients.

173. Repeatedly through Plaintiff's employment with Neon, one or all of the Defendants continued to promise Plaintiff that she would be paid her unpaid $90,000.00 annual salary.

174. Repeatedly through Plaintiff's employment with Neon, one or all of the Defendants continued to promise Plaintiff that she would be paid her earned sales commissions for all tax credits that she sold to new and existing Neon clients.

175. One or all of the Defendants knowingly failed to pay Plaintiff, after two weeks had elapsed from the date upon which it was required to have paid the wages, all wages due for work that she performed, in violation of the MWPCL, Md. Code Ann., Lab. & Empl. § 3-507.2(a).

176. One or all of the Defendants' violation of the MWPCL was not the result of a *bona fide* dispute under the MWPCL and was willful.

177.    By withholding Plaintiff's wages in violation of the MWPCL, one or all of the Defendants are liable for three times the unpaid wages as well as costs and reasonable attorneys' fees incurred in the maintenance of this action pursuant to Md. Code Ann., Lab. & Empl § 3-507.2(b).

178.    Any or all of the Defendants' willful violation of the MWPCL subjects them to civil penalties not to exceed $1,000.00 each.  Md. Code Ann., Lab. & Empl § 3-508.

### COUNT II:
### VIOLATION OF MWPCL FOR FAILURE OF DEFENDANTS, EXCLUDING MCCULLARS, TO PAY PLAINTIFF UNPAID EARNED COMMISSIONS FOR WORK DURING SYNERGI EMPLOYMENT

179.    Plaintiff realleges and incorporates by reference paragraphs 1 through 164 as if fully set forth herein.

180.    The MWPCL requires that "… [E]ach employer *shall* pay an employee … all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated." (Emphasis added).  Md. Code Ann., Lab. & Empl. § 3-505(a).

181.    Synergi, all of the Synergi Individual Defendants, and Defendants Scott and Witcher are employers under the MWPCL, as "employer" is broadly defined as "any person who employs an individual in the State …." Md. Code Ann., Lab. & Empl. § 3-501.

182.    One or all of the Defendants, with the exception of McCullars, failed to pay Plaintiff wages due for work that she performed during her employment with Synergi, including her sales commissions, in violation of the MWPCL, Md. Code Ann., Lab. & Empl. § 3-505(a).

183.    One or all of the Defendants, excluding McCullars, did not act in good faith by refusing to pay the owed wages, even after Plaintiff repeatedly demanded throughout her employment

with Synergi payment of her unpaid earned sales commissions.

184. There has been a delay in payment to pay Plaintiff her unpaid sales commissions owed to her during her employment with Synergi.

185. There has been a delay in payment to pay Plaintiff her unpaid compensation for 184 PTO hours during her employment with Synergi.

186. Repeatedly throughout Plaintiff's employment with Synergi, one or all of the Defendants, excluding McCullars, repeatedly acknowledged that they owed Plaintiff her unpaid earned sales commissions for all tax credits that she sold to new and existing Synergi clients.

187. Repeatedly through Plaintiff's employment with Synergi, one or all of the Defendants, excluding McCullars, continued to promise Plaintiff that she would be paid her earned sales commissions for all tax credits that she sold to new and existing Synergi clients.

188. One or all of the Defendants, excluding McCullars, knowingly failed to pay Plaintiff, after two weeks had elapsed from the date upon which it was required to have paid the wages, all wages due for work that she performed at Synergi, in violation of the MWPCL, Md. Code Ann., Lab. & Empl. § 3-507.2(a).

189. One or all of the Defendants' (excluding McCullars) violation of the MWPCL was not the result of a *bona fide* dispute under the MWPCL and was willful.

190. By withholding Plaintiff's wages in violation of the MWPCL, one or all of the Defendants, excluding McCullars, are liable for three times the unpaid wages as well as costs and reasonable attorneys' fees incurred in the maintenance of this action pursuant to Md. Code Ann., Lab. & Empl § 3-507.2(b).

191. Any or all of the Defendants' (excluding McCullars) willful violation of the MWPCL subjects them to civil penalties not to exceed $1,000.00 each.  Md. Code Ann., Lab. &

Empl § 3-508.

## COUNT III:
## SUCCESSOR LIABILITY OF SYNERGI

192.   Plaintiff realleges and incorporates by reference paragraphs 1 through 164 as if fully set forth herein.

193.   Synergi Holdings, Inc. and/or Synergi Partners, Inc. was created as a corporate entity on or about December 5, 2017.

194.   On or about January 11, 2018, Synergi acquired the shares of Neon.

195.   After the acquisition of Neon shares, Neon continued to do business to assist and/or sell its existing and new clients to acquire tax credits, including but not limited to WOTC tax credits, until its dissolution on or about January 1, 2019

196.   After the acquisition of Neon shares, Synergi has continued to do business to assist and/or sell its existing and new clients tax credits, services and support, including but not limited to WOTC tax credits.

197.   Upon Neon's dissolution on or about January 1, 2019, Synergi has succeeded Neon in conducting Neon's prior business.

198.   Upon Neon's dissolution on or about January 1, 2019, Neon's assets, property and liabilities have been comingled with Synergi's assets, property and liabilities.

199.   Upon information and belief, the Defendants have destroyed the business records of Neon to prevent Ms. Caplan from calculating the sales commissions owed to her.

200.   After acquiring Neon shares and obtaining ownership of Neon, Synergi, the Synergi Individual Defendants, and Defendants Scott and Witcher have comingled Neon funds with Synergi,

201. After acquiring Neon shares and obtaining ownership of Neon, Synergi, the Synergi Individual Defendants, and Defendants Scott and Witcher have siphoned Neon funds to their personal use.

202. After acquiring Neon shares and obtaining ownership of Neon, Synergi, the Synergi Individual Defendants, and Defendants Scott and Witcher have taken actions to inadequately capitalize Neon so that it could not pay for its debt obligations.

203. Synergi, the Synergi Individual Defendants, and Defendants Scott and Witcher knew of Ms. Caplan's wage claims against Neon and Synergi and nevertheless acted in their self-serving and unfair manner by dissolving Neon after siphoning, transferring, and commingling funds.

204. Upon Neon's dissolution on or about January 1, 2019, Synergi, through its shareholders Brown, Scott and Witcher, ratified, confirmed and adopted all actions previously taken by Neon, or by any agent or representative of Neon.

205. As Neon's successor, Synergi is liable for all of Neon's obligations.

206. As Neon's successor, Synergi is liable to pay Plaintiff for unpaid earned annual salary under her 2010 employment agreement, unpaid compensation for earned PTO hours prior to her termination from Synergi, and unpaid earned sales commissions, all of which she earned while employed by Neon and/or Synergi

207. The amount of wage compensation owed to Ms. Caplan exceeds $100,000.00, the exact amount to be proven at trial.

### COUNT IV:
### BREACH OF CONTRACT AGAINST DEFENDANT SYNERGI

208. Plaintiff realleges and incorporates by reference paragraphs 1 through 164 as if fully set

forth herein.

209. Neon agreed to pay consideration in the form of $90,000.00 in annual salary, PTO benefits and sales commissions for Plaintiff's sales efforts as an employee of Neon.

210. Synergi, by and through its shareholders, ratified, confirmed and assumed all obligations of Neon upon its dissolution on or about January 1, 2019.

211. Neon and Synergi, as successor party, has breached the agreement with Plaintiff in that it has failed and refused to pay Plaintiff the consideration under the employment contract between the parties.

212. Plaintiff has complied with and performed all obligations under the employment contract. However, Neon and Synergi, as successor party, have failed and refused to live up to the agreement and has breached the employment contract with Plaintiff

213. As a proximate result of the breach of employment contract by Neon and Synergi, as successor party, Plaintiff has been damaged and has lost commissions and other revenues and compensation from services and/or sales performed under the contract.

214. WHEREFORE, Plaintiff demands judgment against Defendant Synergi in an amount to be determined in excess of $200,000.00, to include incidental and consequential damages together with interest, attorneys' fees and costs.

<u>COUNT V:</u>
<u>UNJUST ENRICHMENT AGAINST DEFENDANT SYNERGI</u>

215. Plaintiff realleges and incorporates by reference paragraphs 1 through 164 as if fully set forth herein.

216. Unjust enrichment occurs when (1) a plaintiff conferred a benefit on a defendant, (2) the defendant retained the benefit, and (3) under the circumstances, the defendant's retention

of the benefit is unjust.

217.  Plaintiff Caplan has conferred a benefit in the form of sales revenue to Neon and Synergi, respectively, and continues to confer a benefit, by her efforts to sell tax credit services and support to new and existing clients on behalf of Neon and Synergi, respectively.

218.  Neon and subsequently Synergi retained the benefit of Ms. Caplan's sales efforts by, among other ways, not paying her unpaid Neon salary, unpaid PTO hours and unpaid earned sales commissions, and Neon and Synergi continue to retain those benefits.

219.  Under these circumstances, Synergi's retention of those benefits is unjust.

220.  Plaintiff's unpaid salary, PTO hours and sales commissions are in excess of $200,000.00, the exact amount to be proven at trial.

221.  Plaintiff has had to retain an attorney and has paid, and continues to pay, attorneys' fees and costs to vindicate her rights arising out of her employment with Neon and then Synergi.

222.  WHEREFORE Plaintiff prays for the Honorable Court to find that Defendant Synergi has been unjustly enriched and, accordingly, shall pay monetary damages to Plaintiff in an amount to be proven at trial, but not less than $200,000.00, and to reimburse Plaintiff for her reasonable attorneys' fees and costs expended as a form of equitable relief.

### COUNT VI:
### CONSTRUTIVE TRUST AGAINST SYNERGI

223.  Plaintiff realleges and incorporates by reference paragraphs 1 through 164 as if fully set forth herein.

224.  The Neon Defendants are the shareholders of Neon.

225.  On or about January 11, 2018, the Neon Defendants sold their Neon shares to Defendants Synergi, Brown, Scott and Witcher.

226.  On or about January 11, 2018, the Neon Defendants transferred substantially all of the Neon asserts to Synergi Brown, Scott and Witcher.

227.  The Neon Defendants, through acts of concealment, misrepresentation and fraud, consciously failed to disclose the obligations of Neon to Synergi in order to prevent the proceeds from the purchase of the Neon stock shares to be paid over to Ms. Caplan, as required by her employment agreement with Neon and the MWPCL.

228.  Synergi hedged against the possibility of fraudulent misrepresentation and/or concealments by the Neon Defendants by withholding the payment of full compensation for the transfer of the Neon stock in the eventuality that undisclosed claims from creditors would be forthcoming.

229.  Synergi holds funds payment to stockholders of Neon, specifically Defendants Scott and McCullars, that, but for the wrongful acts of the Neon Defendants would have been paid to Neon creditors, including Ms. Caplan.

230.  WHEREFORE, Plaintiff requests this Honorable Court to establish the funds held by Synergi to be held in trust for the benefit of Plaintiff, condemn such funds in favor of the Plaintiff in satisfaction of any and all judgments entered against the Neon Defendants, Synergi, and/or the Synergi Individuals Defendants in this matter and for such further and additional relief this Court deems just and proper.

## COUNT VII:
## FRAUDULENT MISREPRENTATION AGAINST ALL DEFENDANTS

231.  Plaintiff realleges and incorporates by reference paragraphs 1 through 164 as if fully set forth herein.

232.  The Neon Defendants, Synergi and the Synergi Individual Defendants represented to

Plaintiff that they, or any of them individually, would pay Plaintiff all of the consideration owed to her as part of her employment with Neon and/or Synergi, including but not limited to unpaid salary while working for Neon and unpaid earned sales commissions owed to Plaintiff as a result of all sales efforts on behalf of Neon and Synergi, respectively.

233. The Neon Defendants, Synergi and the Synergi Individual Defendants made ongoing representations that the consideration, including unpaid salary and sales commissions, due Plaintiff would be paid to her.

234. While the Neon Defendants, or any of them, were making the representations that the consideration, including unpaid salary and sales commissions, would be paid to Plaintiff, they, or any of them, were negotiating with, and making specific representations and disclosures to, Synergi to the effect that neon had no outstanding material obligations that had not been disclosed prior to the sale of Neon Shares to Synergi.

235. Defendant Scott, individually and on behalf of Neon and the Neon Defendants, misrepresented material facts in order to deceive Synergi and in order to deprive Plaintiff of monies due and payable to her.

236. While Defendant Scott, individually and on behalf of Neon and the Neon Defendants, was making material misrepresentations to Synergi, he was representing to Plaintiff that she would receive the monies due her. Plaintiff relied upon those representations and relied upon them to forego any action, legal or otherwise, to pursue the debt at that time.

237. The Neon Defendants, Synergi and/or Synergi Individual Defendants, or any of them, actively concealed information relating to Ms. Caplan's sales and/or unpaid Neon salary.

238. The representations by the Neon Defendants, Synergi and/or Synergi Individual Defendants, or any of them, made to Plaintiff were materially false, and she relied upon

those misrepresentations to her detriment.

239. The misrepresentations and/or concealment of facts by the Neon Defendants, Synergi and/or Synergi Individual Defendants, or any of them, was done with the intent to mislead Plaintiff and to acquire monies that were otherwise payable to her.

240. The misrepresentations and/or concealment of facts by the Neon Defendants, Synergi and/or Synergi Individual Defendants, or any of them, was done with the malicious intent to mislead Plaintiff and/or with reckless disregard for the truth and the resulting damages to Ms. Caplan, and for the purposes of acquiring monies that were otherwise payable to her.

241. As a result of Plaintiff's reliance upon the misrepresentations and intentional conduct of the Neon Defendants, Synergi and/or the Synergi Individual Defendants, she has been caused damages.

242. WHEREFORE, Plaintiff requests this Honorable Court to enter a judgement against Defendants for an amount to be determined at trial, including incidental and consequential damages, and punitive damages, together with interest and costs.

## COUNT VIII:
## ACTION FOR ACCUNTING AGAINST ALL DEFENDANTS

243. Plaintiff realleges and incorporates by reference paragraphs 1 through 164 as if fully set forth herein.

244. Pursuant to Plaintiff's employment agreement with Neon and subsequently Synergi, Plaintiff was entitled to an accounting of all sales revenue generated that was attributed to all sales efforts and corresponding sales commissions earned through those efforts.

245. Defendant Synergi, and prior to that Neon, failed and refused to provide Plaintiff with the

required accounting of sales revenues generated and corresponding sales commissions earned by her during her employment with Neon and then Synergi.

246. Neon and then Defendant Synergi has failed and refused to provide quarterly financial statements setting forth Plaintiff's sales revenue and corresponding sales commissions as promised.

247. On or about January 11, 2018, Synergi purchased Neon stock and, thereafter, represents to the public that Neon is, in fact, Synergi.

248. Upon Neon's dissolution on or about January 1, 2019, Synergi has confirmed, ratified and assumed all obligations of Neon.

249. Upon information and belief, Synergi has either merged its operations with Neon, has absorbed Neon's accounting function, or otherwise has the accounting records of Neon.

250. Synergi has its own accounting records of all sales revenue attributable to Plaintiff's sales efforts as well as her corresponding sales commissions earned while employed by Synergi from on or about January 11, 2018 through December 31, 2018.

251. WHEREFORE, Plaintiff requests that Defendant Synergi provide an accounting to her of the quarterly financial records of all sales revenue attributable to all sales efforts as well as her corresponding sales commissions earned while employed by Neon from on or about January 1, 2015 through on or about January 11, 2018, including but not limited to continuing revenue earned from new and existing Neon clients attributable to Plaintiff's sales efforts through on or about December 31, 2018.

252. Furthermore, WHEREFORE, Plaintiff requests that Defendant Synergi provide an accounting to her of the quarterly financial records of all sales revenue attributable to all sales efforts as well as her corresponding sales commissions earned while employed by

Synergi from on or about January 11, 2018 through December 31, 2018.

## PRAYER FOR RELIEF

253.   WHEREFORE, Plaintiff respectfully requests that this Court:

    A.   Declare one or all of the Defendant's conduct to be in violation of the MWPCL;

    B.   Enjoin one or all of the Defendants to comply with the MWPCL;

    C.   Award to Plaintiff her unpaid wages, including but not limited to unpaid Neon salary, unpaid PTO hours and unpaid sales commissions, plus treble damages under Maryland law;

    D.   Award to Plaintiff her costs and reasonable attorneys' fees incurred in this action;

    E.   Enter judgment against Defendants for constructive trust, breach of contract and/or unjust enrichment, and fraudulent misrepresentation;

    F.   Award to Plaintiff punitive damages against Defendants for their fraudulent conduct;

    G.   Enjoin one or all of the Defendants to provide a detailed accounting of all invoiced revenues (new business) collected by Neon and Synergi upon which Ms. Caplan's total sales commissions may be calculated;

    H.   Award Plaintiff prejudgment and post-judgment interest as permitted by law; and

    I.   Grant such other and further relief as the Court deems just and proper.

Dated: March 13, 2019

Respectfully submitted,

KALBIAN HAGERTY, LLP

By _____

Eric L. Siegel (Bar No. 9606110006)
888 17th Street, N.W., Suite 1000
Washington, D.C. 20006

(202) 419-3296 (Office)
(202) 223-6625 (Facsimile)
esiegel@kalbianhagerty.com

*Attorney for Plaintiff Marla Caplan*

## MD RULE 1-313 CERTIFICATION OF ATTORNEY WITH OUT-OF-STATE OFFICE

I HEREBY CERTIFY THAT I AM A MEMBER IN GOOD STANDING OF THE

MARYLAND BAR WITH BAR NUMBER 9606110006.

Eric L. Siegel

## DEMAND FOR JURY TRIAL

Plaintiff Marla Caplan respectfully demands a trial by jury.

Eric L. Siegel